Good morning, your honors. My name is Daniel E. Murphy, and I represent Officer Allen Young, who is the petitioner in this case and the appeal seeking to reverse the commission's decision on the basis that, primarily the basis that it is against the manifest weight of the evidence. In particular, in this case, it is clear, based on the admissible evidence of record in this case, that Officer Young's injuries did arise out of his employment as a police officer at the time of the accident. The officer is a rope officer. He's a neighborhood officer. On the date in question, he's on duty? Yes. He goes to his mother's house to drop off a table? Correct. Going to his mother's house, was that a matter of personal business, or was that a part of his official duties to drop off a table? As a rope officer, it is a community-based house where the officers are essentially a mini-police department. They move in with their families in a house that the city of Elgin owns. And as a course, in the course of doing that, they live there and they are available to the community to do community service. But what I'm getting at, when he went to his mother's house, he was not called there, was not a part of his official duties to go there at that time. He's dropping off a table. Well, I would respectfully disagree. From the standpoint, he was returning a table that he had used for the two years before at the J Street Rope House. He was moving to the Raymond Street Rope House. He was returning the table that he used for work. But I'm trying to get the connection between returning the table and his official job duties. He had to move out of the Rope House, vacate that Rope House. He was paid for three days. Elgin rented him a truck to do that. He had other officers helping him. He moved a table that he used for official business, which Elgin doesn't take issue with. He was using that in the Rope House to do his police work. Put the computer on, do his record keeping and the various things that he needed to do at the Rope House. They don't, they actually live there and that's their station, so to speak. They don't go down to the main station or any of the other precinct stations. They do their work there. And so they process their reports and all of that kind of thing. So at the time of the accident, he was returning the table that he had used. In your opinion, as I understand, that's part of his official duties. Yes. Returning a table to his mother was part of his official duties that day. Correct. And Elgin's never taken dispute with that. In fact, the diversion argument from Elgin's standpoint begins at the point where he's returned the table and he begins to do a Terry stop and question. He's doing a Terry stop on his adopted brother in the house. Absolutely. On what basis is he doing a Terry stop in the house of his brother? The reason he was doing that was because his brother was a runaway the day before and returned the day before. He was investigating his runaway status and he also noticed that he was, he had a CD player and headphones on, which based on his reasonable suspicion, he believed to be stolen. So under Terry, and this is what the testimony was in this case, he had reasonable suspicion to believe based on all of the inferences and information he had about this individual that his adopted brother had stolen these headphones. Let's talk about that observation. Wasn't the commission troubled because didn't the claimant opine that if somebody was operating, walking down the street with a headset, he might inquire as to where they got it? Wasn't there an issue that troubled the commission about that? I didn't see that in the commission's report. And I guess what you're saying is, well, how does this make it different from the general public? And the reason it makes it different is because he's a police officer and all the testimony in the case from Deputy Chief Swoboda to Gorkowski, nobody takes issue with the fact that he's on duty 24 hours a day, that he has to investigate crimes. There isn't an issue that there is no standard operating procedure of the Elgin Police Department as to how to investigate alleged crimes of family members. And with respect to this issue, there is really no contrary. There was no evidence that came that was of record that suggested that what he was doing at the time was not an official police function or not a Terry stop. Arbitrator Kinnaman found that it was based on the evidence that was produced. None of the other, the only officer that really talked about the specifics of this incident was Officer Young. And Officer Young's uncontroverted testimony was that he was doing a Terry stop. He did not, he was trying to develop probable cause. He did not have an opportunity to call his supervisor. Because he got attacked and stabbed about the torso and eventually had a lacerated liver and went right into surgery. And he didn't have time to call to deal with that issue. The concern is, where's the line of demarcation?  In that case that you just mentioned, I don't think it would be because that's a purely personal dispute. The only questions, the only issues that were raised in the conversation and in the testimony in this case, as between Robert, in the admissible evidence, as between Robert and Alan Young, was the fact that he was doing a Terry stop. He was investigating the crimes. And apparently Robert took exception to that and came and knifed him multiple times about the torso. And I understand what you're hanging your head in. And that's obviously something we have to decide. You're saying that he got there and then because of the unique circumstances, it turned into a sort of a criminal investigation, so to speak. Had he gone there to return the table and got into a fight over something totally unrelated to his work as a police officer, then arguably it would not be compensable. Then it would be purely personal under Huddleston and he wouldn't recover. And if we look at the way that they arrived at the decision in this case, this decision from the commission is replete with hearsay, with conclusions and findings that are not of record, that are pure speculation. For instance, paragraph 12 of the decision says, another witness for Respondent testified that he interviewed Petitioner's brother Robert. There was no evidence in this case that supports that finding. And then it goes on to say, Robert, who heard voices, who told him to put a knife in his pocket because Petitioner was coming over and was going to do something that Robert did not like. Petitioner told Robert that he could not keep the CD player because he got it while he was on the run. When Robert indicated he did not understand Petitioner, got agitated, pushed the chair aside, took off his sweater and watch, and then it kind of switches, grabbed Petitioner. Now Robert's grabbing Petitioner and threw him to the floor and he accidentally stabbed Petitioner during the struggle. The only place that this came from was Respondent's Exhibit 2, which is inadmissible hearsay, which was properly ruled on by Arbitrator Kinnaman and kept out. They put it back in. We didn't have the police report was replete with what the charges were, convictions, statements, hearsay statements of various other people, including Robert. Robert never testified at this. This is, this finding here fits fully within the Duran case. There was no evidence on that particular case. I thought I was looking for it. The Commission noted it was skeptical of the claimant's contention that he would have confronted a subject who was in possession of a portable CD player merely because he did not know how the subject obtained the item. All right. The Commission found the record suggested the claimant was enforcing discipline on his brother as a familiar authority and not as a police officer. So can't they legitimately come to that conclusion? I don't believe so, because if we go through this, I have gone through it in the brief about Robert. Let me ask you a question. He's a rope officer, right? Yes. Is his mother's house within the area that he was assigned to work in? No. Okay. Do rope officers work outside their own area on a regular basis? All Elgin officers, the evidence is that all Elgin officers are empowered to make... I didn't ask that question, what they were empowered to do. I asked if rope officers regularly worked outside their own area. Generally, no. Okay. So we've got him, and do the police officers generally take their wives along to help them? During the move, they're empowered to go wherever they need to go. That's not my question. My question is, do they generally take their wives along to help them do their work? I would think not. I would think not also. So we've got the petitioner with his wife helping him move a table to his mother's house to return this table, to his mother's house, and he's got a half-brother or adopted brother, whatever he is, who's a runaway, who's in the house, and he gets stabbed, and the allegation is he was investigating a possible crime? Right. And the commission isn't empowered to say, that sounds pretty hokey to me, and we're not buying this. And why aren't they entitled to do that? I'm sorry, I didn't hear you. Why aren't they entitled to do that, to say that sounds pretty hokey to me? You're in there enforcing discipline on a 16-year-old that's a runaway, and, unfortunately, he's stabbed. Here's why. Because Deputy Chief Swoboda testified that he is empowered, as did Officer Laney. No one disputes he's empowered to do it. Right. The commission just didn't believe he was doing it. The commission just believed he was enforcing discipline on a half-brother. I understand that. And the only reason that they're saying that, the whole topic, the only evidence about this entire situation was that the discussions concerned the two crimes relating to the runaway status and also whether he stole the headphone. And it didn't get any further than that. And that is what he's empowered to do. That is what he's required to do under his oath of office. There are no SOPs from Elgin relating to what an officer should do under those circumstances, which Elgin could have promulgated, which could have made it ultimately clear what he was supposed to do under the circumstances. But I can't deny that his family members were there. I can't deny that Officer Young, I can't, Thelma Young, the mother was there. She was there as well. Officer Young, there's no evidence that he was a father figure at all. There's no evidence he ever lived with Robert. There's no evidence that he ever disciplined him. There's no evidence that he did anything as a familial father figure, essentially. And there isn't really any evidence that there isn't one around with Thelma to begin with. And Thelma's there, the mother, and she is the one who is the adoptive mother. And she was there at the scene at the time. So from that standpoint, yeah, the bright line test, I suppose, if we come down to it, okay, any officer that questions a family member, it's automatically non-compensable because as a matter of law, then it means it's purely personal simply by virtue of the relationship or the fact that it's in the home. No, you're taking it too far to the extreme. It just boils down to the question of whether the commission believed his story. They turn around and say, listen, this is pretty hokey. When's the last time we heard of someone arresting their own brother because he had a set of headphones on? It sounds like a made-up story. So we're not going to believe him that he was doing that. And so if they turn around and say we don't believe that he's doing that, we believe that he's engaging purely personal behavior, why can't they do that? Because the way that they did that was they made findings that were not of record in order to arrive at that result. All right. Counsel, your time is up. You'll have time to pick this up on rebuttal. Counsel, please. Morning, Your Honors. Brett Beer of Brady and Jensen on behalf of the City of Elgin and Elgin Police Department. I'm not going to go through all the facts. I'd like to focus on one aspect that really wasn't discussed by counsel much in his brief board today, and that's at the point where Officer Young, he had this interchange with Detective Gorkowski called a verbal altercation in which he told Robert, I'm going to take those CDs or headphones away from you. And there's some questions. What's the source of that testimony? The source of that testimony is on a few pages. Page RC183 of the record. Was that the police report? No. The police report, there's two places where it occurred. There's one in our exhibit, Elgin's Exhibit 1, which was rejected by the arbitrator. That was under the best evidence rule. There was a recording and a statement, and it was transcribed word for word. We tried to admit it into evidence as a business record and all that, except for the hearsay rule, since it was an accurate word for word. In that document, it did say that at some point in time, this is the detective asking him, Officer Young, at some point in time you told him you were going to take the headphones away from him, and the officer answered yes. That's one place where it occurred. The other place is in the testimony of Detective Gorkowski himself. Counsel was asking him, and this is where it appears in the record on page 183 of the record. He was asking him in general about whether he was an aggressor or not, and the question was, on page 182, counsel asks, there is no evidence that you gave, excuse me, there was no evidence that you are aware of, no credible evidence that Al Young was in any way the first aggressor in this incident. And the answer from Detective Gorkowski is, there is nothing to state that he was the aggressor. Next question, no basis that in any of the investigation that you performed, right? And the answer, other than he got into a verbal altercation, I mean, he wasn't an aggressor. So there he was talking about a physical aggressor. And then later on in the record, on page 192, when I was questioning Detective Gorkowski, I said, I questioned, I said, what did you mean by verbal altercation? And the answer that he gave was, well, according to his statement, he's talking about the statement that he gave, Officer Young, according to his statement, he acknowledged that he got into a verbal altercation with Robert over the CD player. He was challenging him on whether or not it was stolen or not, and that Al, or Al Young, advised that he also didn't like the fact that he had been a runaway and was listening to it, so he listened to music and got to walk around the house. Then on page, last section that I'll point to, page 199 of the record, I again asked Officer Gorkowski, do you recall any point in time whether Mr. Young told you or made any reference to him within this verbal altercation that you talked about, about making any statements as to what he was going to do to Robert Young in relation to the CD player? And the answer that Detective Gorkowski gave was, he was trying to take it away from him. It refers to the CD player. The commission didn't buy your aggressor argument either. They didn't buy that he was doing a terrorist act. They didn't buy that he was an aggressor. They just simply found that they didn't believe he was acting in a police capacity. They found that based on these facts, they thought he was doing nothing more than enforcing family discipline. Right. Which was one of our arguments. The aggressor argument wasn't our only argument. We understand that. Yes. But, but, sorry. So my question is, is the commission entitled to do that based upon the facts in this case? In that case, I would have thought it would, it's our position that it's against the manifest way to the evidence because what they said was, the commission said that the only evidence that we offer. Now, what is it? Did both of you argue in the commission's decision against the manifest? Did you appeal? No, no, no. I mean, come on. Well, you just asked the other. You just asked the other. You won on an issue. Right. The question becomes, and let's get, quit fooling around with the other stuff. Right. The question becomes, is the commission's determination that he was not acting as a police officer against the manifest way to the evidence or isn't it? And I think your position is that it's not. That's right. And I would like you to tell me why. That it was not against the manifest way to the evidence? Yeah, why isn't it against the manifest way to the evidence? Because, well, if you're looking at the personal, because, well, first of all, he, the counsel talks about he had no relationship or he didn't know anything about him. He wasn't a father figure. What the record shows is that Robert was adopted seven years prior. Obviously, Officer Young admitted that he knew him because he told Detective Gorkowski and he testified that he was aware of his past problems with six fights at school. He was a habitual runaway. He used to steal a lot, although there was no record. He didn't know whether he was actually convicted of stealing. He did not like, so he knew all these things about him. And then when he actually talked to him, he didn't like the fact that he had run away all week long. He was allowed to listen to music and walk around the house. He thought he might have stolen those things. The city player, he was, and then he was going to take them away from them. So, yeah, this argument, the city's argument that this is a personal dispute, which is what the commission concluded, and that's not against the manifest way to the evidence. Is there any evidence in this record that he testified that if he found out that these headphones were stolen, he was going to arrest him? He said, in fact, he said he had absolutely no intent to arrest him. So the policeman had no intention of arresting this individual who he was questioning as to whether his headphones were stolen or they weren't stolen. Now, is that acting in the capacity of a policeman or is that acting in the capacity as a half brother? That's acting as a half brother if he had no intent to arrest him. Now, the terrorist business, did he pat him down? No. Okay. Didn't search for any guns or knives? No, he did not. Didn't put them up against the wall? No, he did not. No, he did not. Had there been a recent crime that he thought that he may have been involved in that he wanted to stop him and talk to him about? No. In one of the cases that they cited, it was interesting, an Elgin case, this Pantoja case, in a reply brief talked about one of the things that they looked at is did he receive any report from the stolen vehicle? But, no, there was nothing like that in the record. There was no evidence that he had other than his own hunch, personal hunch, which the Terry Stock cases say is not enough to establish reasonable suspicion. There was no evidence other than he, you know, had a personal hunch that he may have stolen. So this boils down to a simple issue. The petitioner says, I was acting as a policeman all the time that I was doing all this. And the commission turns around and says, nonsense. You weren't acting as a policeman. You were acting as a brother, and that's not compensable. We're not giving you any money. Is the entitlement to that? Yes. Okay. Did the commission rely on the fact that the brother was not charged with aggravated battery on a policeman, but he was charged and convicted of domestic battery? Did the commission rely on that? They said in their decision that that was dicta. They said it was. . . one second. Did they say it was dicta, or wasn't that a full paragraph they spent in what they justified their decision on? On page four of their decision, they talk about the commission found interesting, but clearly not dispositive that Robert was charged with an aggravated domestic battery, aggravated battery, and apparently pled guilty to aggravated domestic battery. And all of that is from this Exhibit 2, which I agree. Would their decision have been justified independent of that? Yes. Do you think it was improper for them to rely on that? They should not have relied on Exhibit 2, which is the police file, which was not in evidence. I'll agree with that. Paragraph 12, in their findings of fact, they refer to the statement that was taken by someone from Robert. Was that admissible? Could they have properly relied on that? No. No, they could not have properly relied on that. No. Does a policeman have the right to talk to a citizen if they're willing to speak with them without justification as a Terry stop? Do they have a right to speak to them? Sure. Policemen have a right to go up and talk to somebody, ask them a question, and then they can respond. Is there any prevention on that? No. He's not required to have Terry v. Ohio requirements to do that, is he? No, he's not. And in this instance, this policeman knew the young man did not have any prior headphone or anything else in the past. I assume he was aware of his financial ability and then realized he had these things. Why wasn't it reasonable for him to do that? Well, he could have asked him it, but it wasn't in his capacity. The evidence is that it wasn't in his capacity as a police officer. It wasn't in his capacity as a police officer. Right. He's just asking him as a father figure or older brother figure. It could have been, but the commission ruled the other way. That's right. Essentially what they ruled is that his duties on behalf of the Elgin police ended when he delivered that table. Does an individual who happens to be a policeman and have children have a right to ask their children where they got property that they had never seen before? Sure, you can ask your own children. Can they do that as a father, or does it have to be in the capacity as a policeman? You could do that as a father, yes. Okay. So you're really saying that what this officer was involved in was a personal diversion? Yeah, among other things, it was a personal diversion. The other thing is that he violated, which we haven't really talked about, he violated specific policies. Deputy Chief Swoboda stated that police officers are not authorized to remove property from suspects unless they know for a fact that they have some confirmation that the property is stolen. So even if he had a hunch and said, hey, even if he was acting as an officer, which we don't even think the Terry Stott cases are relevant for the reasons stated in our brief, that it wasn't proper because, you know, he was operating on a hunch. And number two, he was violating the Elgin policy of removing property from somebody that he didn't have a good reason to do for. He didn't know it was stolen. He just thought it was. And Elgin doesn't authorize our police officers to engage in unreasonable risks. Well, that wouldn't be a determined effect. If an officer stops somebody on the street and then in hindsight it's determined by the court that it was an invalid stop without probable cause, and the officer is shot, the city is going to take the position that it's not compensable because you went too far in removing the property, is it? If he's not – in a situation like this, if it just involves a family member, no, no. I'm not talking about – you said that there's a violation of policy almost like that. That was the controlling factor. Well, I think that's what you look at is whether Elgin police officers don't – I mean, the city of Elgin doesn't want to authorize their officers to remove property from suspects and the public in general. But if they do, that is not the determining factor in whether it's compensable, correct? Well, I would say that would be one fact. I respectfully disagree that that would be a factor. That would be – if you're going to overstepping your bounds and you're not – if you're going beyond stated police policies, then you've stepped over the line again. Violation of rules is not a basis for denying compensation benefits unless the violation of the rules takes you out of your employment capacity. And just because a policeman violates the rules when he questions a suspect doesn't take him out of his employment capacity. So, I mean, okay, he violated a rule. I don't know how relevant that is, but – Well, yeah, you had a station whether it rose out of his employment versus in the course of employment. I agree. It's not a – he would still be in the course of his employment, but as the case laws I discussed in my brief, in a specific – and there are cases where the police officers are in the course of employment, but what they do does not arise out of employment. Not every injury that occurs while they're on the clock is compensable. Thank you, counsel. Rebuttal, please. Counsel, before you get too far in the argument, can you answer the question you're opposing counsel raised? If, in fact, Mr. Young acknowledged he was not going to arrest the juvenile, to what end, then, is he conducting this Terry stop that you're hanging your hand at? He didn't have time. The evidence in the record indicates that he did not – he was – a Terry stop, as I understand it, and I've not been a police officer, is – allows the officer who has reasonable suspicion to attempt to develop probable cause by questioning, detaining, and questioning a witness. That was what he was doing. You actually believe that he was conducting a Terry stop and intended to arrest this kid if those headphones were stolen? All Terry stops do not end up in arrests. The question is, do you believe that? I don't know what he was going to do. A Terry stop, the end is an arrest. We're doing this because we want to accomplish something in the future. If I have no intention of arresting this person for anything, I'm not going to conduct a Terry stop. I'm going to wave bye-bye. He's gone. I understand your point. My point is that he did not, at that time, he did not have the intention of arresting him because he only had reasonable suspicion. And he got – he got – Are you agreeing with the question that you have to have the end goal of arresting the person that you are interrogating? You can have the end goal. You can, but I mean, I think you're saying, oh, if it's determined that he wasn't going to arrest this person, that therefore he wasn't engaged in police activity. I see what you're saying. Are you agreeing with that? No, I'm saying that in this set of circumstances, given these factors and the evidence of record, not the things that the commission wrote about, about charges and convictions and whether you – Don't police all the time do investigations and decide, yeah, we'll come back later and arrest the person maybe once if we find out. Because, you know, I mean, unlike – I won't say it, but some U.S. attorneys close traps before they get everybody in. Some investigators leave things open to find whether there are conspiracies or gang-related activities before they go and close traps. I think that the salient facts in this case are that the only things that were discussed were the crimes, whether it was a statistical crime relating – it wasn't – it wasn't who's doing the household chores. It wasn't a familial fight about what TV station to – to watch. This was him doing a uniquely police function of interrogating him, and he didn't get any – What is a – He didn't get any further before he got stabbed. Excuse me. What is a uniquely a police function to ask a kid where he got headphones that he never had before? Why? Fathers don't do that? He's not the father. No, no, excuse me. He's an older brother. Older brothers? Mothers don't ask them to do that? Mother's there. Mother's there. So brothers never do that? He is not – he is not adopted. Excuse me. Brothers never do that? Brothers never – they can't do that? They're not family members? My brother doesn't. My brother doesn't. Let's get this thing down to basics. They didn't believe this guy. They didn't believe he ever had any intention to arrest this kid. They didn't believe he was ever conducting a police investigation. They believed that he was an older brother asking a younger brother, where did you get the headphones? He admitted on cross-examination he intended to talk to them about the headphones. Okay. The kid gets mad and he stabs him. I see where you're going. The only evidence that they have to say, to arrive at the decision, because the evidence that they purported to rely on is not based on any of the evidence of record. It's all based on speculation and inadmissible hearsay. The sole fact, and that's why I said this before, is the fact that they are related by adoption. And this is a result-generated – it's obvious based on the way that it's written. It's a result-oriented opinion. And it leaves us with a bright-line test of if you're a police officer and you're involved in investigating a crime of an alleged family member, you're out of the box, you don't get any – there's no way you can have compensation. Presupposing he was investigating a crime. That's your presupposition. That's what they didn't believe. That is the only evidence of record. No, but they don't believe that evidence. And the evidence comes from his mouth. They say, we don't believe you. They don't say that. What do they say? They don't say he's incredible. The only person that they say who's not credible is Robert. Because – and why they made a finding that a hearsay statement – that they're reviewing a hearsay statement and that it's not credible when it's not – The record clearly suggests that the petitioner was enforcing punishment discipline on Robert as a familial authority figure and not as a police authority figure, is what they found. And that's their entire decision in one sentence. And why can't they – I understand what you're saying. It's not based on the evidence. But why can't they simply reject the claimant's testimony? He's on duty. He's walking around the backyard. He claims something fell out of the sky and hit him in the head and there's no evidence. They can disbelieve that. They have to find it's compensable. They have to believe the claimant's version. Is that what you're telling us? No. What I'm saying is that the only evidence in this case that they can rely on to indicate that – to back up that finding is a simple adoptive family relationship and that's it. So then we come to a bright line. Your time is up, counsel. Thank you. The court will take the matter under driver's disposition.